[ PHILADELPHIA, APRIL 2D, 1840. ]

## HEIDLEBERG *against* LYNN.

APPEAL.

1. Under the act of 1836, § 9, it is not necessary that there should have been a contract for service for a year, to gain a settlement: it is sufficient if there have been a service for a year under one or more contracts.

2. Where the pauper had been hired in the manufacture of gunpowder, at a certain sum per 100 pounds, and three months' notice on each side of an intended determination of the contract was stipulated for, and it appeared that he had occasionally worked out on his own account during the period of his hiring, it was *held*, that he had gained a settlement by the hiring.

THIS was an appeal from an order of the Court of Quarter Sessions of the County of Lehigh, quashing an order made by two justices of the peace, for the removal of one Nathan Lynn, a pauper, from the township of Lynn to the township of Heidleberg, in that county.

The question was, whether the pauper had gained a settlement in Lynn township; and upon this subject the testimony in the Quarter Sessions was as follows:

Andrew Eisenhart, of Lynn township, testified as follows: "I knew Nathan Lynn in his lifetime, he being now dead; he

(Heidleberg v. Lynn.)

was unmarried and had no child; he came to me on the 16th day of January, A. D. 1838, and lived with me until the 3d day of July, 1839, then died; we had a parol contract; I was to pay him seventy-five cents for every hundred pounds of powder he was to make for me; he worked under that contract to the 8th of March, 1839, until he was blown up in the mill; he had his place of residence with me, and he boarded and lodged with me during that time; during all that time Nathan Lynn was with me, I lived in Lynn township, Lehigh county, and I still reside in said township. As far as I know, the said Nathan Lynn voted at the general election in October, 1838, in the said township of Lynn." Cross-examined:—"During the time from the 16th of January, 1838, until the time he was blown up, he worked for me, excepting a few days of which he did work for my neighbours: he worked several days for Peter Neff, and in harvest time, for John Mosser, and with his father did thrash several days, his father at that time resided in Heidleberg township; I cannot say how long his father, John Lynn, resided in that township, he having lived there before I came to that neighbourhood; I knew him about eleven years; he owned land there; Nathan Lynn lived with his father to the time he came to me; as much as I know, Nathan was not quite twenty-one years of age at the time he came to me; we did the washing and mending for Nathan; I do not know that Nathan took any of his clothes to his father's at the time he thrashed for him, to be washed. I did not see him vote at election. I made the bargain with Nathan at his father's house; his father was present and said nothing. My powder mill was not running the whole time from the 16th of January until it was blown up; I cannot tell exactly how long it laid still; sometimes it would lay still four weeks in the winter; during those intervals, Nathan now and then did labour work for me, and then went to school. I do not know that he did work for other people other than what I have before said. Sometimes the mill stood still in summer time half a week, and sometimes two weeks, and in the winter season, sometimes more than four weeks, and during those intervals, Nathan had a right to go where he pleased. I never settled off with Nathan quite; I paid him according to our contract, seventy-five cents per one hundred pounds." Re-examined:—"The reason the mill stopped, was on account of the ice in winter, and at times for having too much powder on hand. It is customary in our neighbourhood, for men to go out in hay-making time and harvest, to help their neighbours in work; Nathan had work about the mill at the times she stood still, in drying and packing powder. Nathan went to the common school." On his further cross-examination:—"The mill was stopped sometimes for a few days. The agreement between me and Nathan was, that if he was to leave me, he had to give me three months previous notice, and I, in case I was to hire some other hand, and to dismiss him, give him also three months notice before;

(*Heidleberg v. Lynn.*)

he could have left me at any time of giving me three months notice. It is the duty of the powder maker to dry and pack the powder made by him." Re-examined again :—" At the times the mill stood still, he was drying and packing powder."

Tobias Smith, of the township of Lynn, testified—

" I have known Nathan Lynn; I cannot tell exactly how long he was with Andrew Eisenhard, but he was there from January, 1838, until the mill blew up in the year 1839. Nathan was a single man, and without children. Nathan Lynn voted at the general election, in Lynn township, in October, 1838; I saw him vote; I was then the inspector of the election for the said township. John Lynn removed to the state of Ohio, in October, 1838." Cross-examined. " I knew John Lynn from the time of my boyhood, and he lived in the township of Heidleberg, Lehigh county. Nathan had his home with his father, till he came to live with Eisenhard. I know nothing of the bargain between Eisenhard and Nathan, but that Nathan had to get seventy-five cents per hundred pounds of powder. I live about three-fourths of a mile from Eisenhard's. I came to the mill when she was going, and I came there too when she stood still." Re-examined :—" Eisenhard lives in Lynn township, the mill was in Lynn township, and Nathan was blown up in Lynn township."

Peter Neff, of Lynn township, testified as follows :

" I know Nathan Lynn: he was with Andrew Eisenhard, in Lynn township, and made powder in the powder mill; I cannot tell how long he worked in the mill; he was better than one year there; during the time he was with Eisenhard, he mowed one day, grass, for me, for which I paid him. Nathan told me that at times when he had not work in the mill, he had the privilege to do work out for his own account. I asked Eisenhard whether I had to pay Nathan or him for the day's mowing, and he told me that all what Nathan earned out that way belonged to him, and upon that I paid Nathan; I live a mile, or perhaps a little better, from Eisenhard's; I often passed the powder mill; the mill could not always go, on account of the water; the water in summer time often failed. I don't know what Nathan had to work when the mill was stopped; in the cold winter months the mill did not much go, that is, in January and February, she was most of the time fast. I knew the father of Nathan when he was yet a boy. I cannot tell how old Nathan was when he came to live with Eisenhard, but I heard tell that he was not quite of age; Nathan had his home with his father in Heidleburg, until he went to work for Eisenhard." Cross-examined. " I do not exactly know the line dividing the townships of Lynn and Heidleburg; I cannot tell how far John Lynn's house is from the line in Heidleburg; John Lynn lives on Rupert's place, and owned land in Lynn township." Re-examined :—" John Lynn had his

(Heidleberg v. Lynn.)

land in Heidleberg, paid his taxes in the said township, and also voted in the said Heidleberg township."

On the 5th of December, 1839, the Court of Quarter Sessions quashed the order of removal. Whereupon the overseers of Heidleberg township appealed to this Court.

The errors assigned were as follows:

" 1. The Court erred in quashing the order of removal.

2. The Court erred in deciding that the pauper had gained a settlement in Lynn township under the hiring and service set out in the evidence."

Mr. *Mallery*, for the appellants, referred to the ninth section of the act of 1836, and cited *Burrow's Settlement Cases*, 439, 513.

Mr. *Gibons, contra*, cited 2 *Botts's Poor Laws*, 525; *Burr. Sett. Cas.* 251. 690. 741. *Rex* v. *Preston*, (3 *Burn's Just.* 537.) *Archbold's Poor Laws*, 40. *Tioga* v. *Lawrence*, (2 *Watts*, 43.)

The opinion of the Court was delivered by

Gibson, C. J.—As our system of poor laws had its origin in that of England, and as many of her statutory provisions were re-enacted here, we must turn to some of them to have a view of the whole ground in contest. By the 3 & 4 W. & M. c. 11, " If any unmarried person, not having a child or children, shall be lawfully hired into any parish or town for one year, such service shall be judged a good settlement therein." The insufficiency of this was that it went no further than the 5 Eliz. c. 4, which also prohibited a retainer for less than a year; and the insolence of servants, it is said in *Dunsfold* v. *Ridgwick*, (2 *Salk.* 535,) gaining a settlement, as they did by the 12 Car. 2, led the way to the 8 & 9 W. 3, c. 30, by which it was enacted, " that no person so hired as aforesaid, shall be adjudged or deemed to have a good settlement in any parish or township, unless such person shall continue or abide in the same service during the space of a whole year." Hence, it became indispensable to a settlement, that there should have been both a hiring and service for a year. Our law seems to consider service alone as the meritorious cause, and to require that there should have been a contract for it, only as a proof that it was valuable, and distinguishable, in that respect, from those feeble and trifling acts which are sometimes performed in requital of a gratuitous maintenance: in other words, to show that, instead of having been a benefit to the township as a producer, the pauper had been a burthen to it as a consumer, from the beginning. In the ninth section of the statute of 1836, it is enacted, that a settlement may be gained " by any unmar-

(*Heidleberg v. Lynn.*)

ried person, not having a child, who shall be lawfully bound or hired as a servant within such district, and shall continue in such service during a year." It is scarce necessary to remark on this, that time is predicated of the service, and not of the contract; and consequently that what is required, seems to be no more than a continuance in hired service during the period. It is therefore enough for the purpose that the pauper has been in uninterrupted employment, whether under one contract or any number of contracts. Now the reason why service under a hiring to do job or piece work, gains no settlement by the British statutes, is not that the service, but that the contract, does not come up to the exigence; and the *King* v. *The Inhabitants of St. Peters in Dorchester*, (2 *Bott's Poor Laws*, 197,) was decided expressly on that ground. But though the contract need not be continuous, yet where there is an apparent gap in the service by temporary cessation from active duty, the terms of the hiring may be consulted to ascertain whether the pauper was not in the constructive service of an employer; and on such an enquiry decisions on the 8 and 9 W. 3, may afford very valuable assistance. The leading principle of these is, that temporary absence from actual service, if it discharge not the contract, breaks not the relation of master and servant, it being sufficient that the pauper did all that was required of him. In the case before us, as payment in proportion to the product was stipulated to fix the rate of wages, it might easily be maintained that the hiring was not by the piece, but for an indefinite time. Was there, then, an existing contract at those intervals when he was absent on leave? The hiring was general, and on terms which forbade either party to put an end to it without three months notice; which, according to *Rex* v. *Wincaunton*, (2 *Bott's Poor Laws*, 195,) is, by implication, a hiring for a year. Notice of dissolution had not been given; and the relation of master and servant consequently existed at the periods of absence. It seems therefore that the pauper had gained a settlement in the township of Lynn.

Order of the sessions affirmed.